**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

ALIGNMENT HEALTHCARE INC.,
1100 W. Town and Country Rd.
Suite 1600
Orange, CA 92868,

*Plaintiff*,

*v.*

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES,
200 Independence Avenue, S.W.
Washington, D.C., 20201;

CENTERS FOR MEDICARE & MEDICAID
SERVICES,
7500 Security Boulevard
Baltimore, MD 21244;

XAVIER BECERRA, *in his official capacity as*
*Secretary of Health and Human Services*,
200 Independence Avenue, S.W.
Washington, D.C., 20201; *and*

CHIQUITA BROOKS-LASURE, *in her official*
*capacity as Administrator of the Centers for*
*Medicare and Medicaid Services*,
7500 Security Boulevard
Baltimore, MD 21244,

*Defendants.*

Case No.: 25-cv-74

---

**COMPLAINT**

Plaintiff Alignment Healthcare, Inc. (Alignment), for its complaint against defendants U.S. Department of Health and Human Services (HHS); Centers for Medicare & Medicaid Services (CMS); Xavier Becerra, in his official capacity; and Chiquita Brooks-LaSure, in her official capacity, alleges as follows.

**TABLE OF CONTENTS**

Introduction ......................................................................................................... 1

Jurisdiction and Venue ....................................................................................... 4

Parties ................................................................................................................. 4

Statutory and Regulatory Background ............................................................... 5

    A.   The Medicare Advantage and Medicare Part D programs ..................... 5

    B.   The Star Ratings system and score calculations ................................... 7

    C.   The purpose and effect of the Star Ratings system ............................... 9

    D.   Non-CAHPS measures and the Tukey Outlier Deletion Rule.............. 12

    E.   The CAHPS surveys ............................................................................ 13

    F.   Reconsideration of coverage determinations and IRE review ............. 15

    G.   Plan sponsor participation in Star Ratings (plan preview periods) ...... 18

Factual Allegations ........................................................................................... 19

    A.   Application of the Tukey Outlier Deletion Rule to small-
        denominator non-CAHPS measures produces arbitrary results .......... 19

    B.   Unexplained drop in Spanish-language response rates suggest either
        a sampling error or mistakes in distributing Spanish-language
        questionnaires ......................................................................................24

    C.   CMS's methodology for calculating CAHPS-measure Star Ratings is
        biased toward plans with larger member populations .........................28

    D.   Maximus departed from CMS guidance and its own manual in
        reviewing Alignment's dismissal of an appeal....................................29

    E.   Maximus incorrectly overturned Case 1-12757246876.......................32

    F.   Final agency action..............................................................................33

Claims for Relief .............................................................................................. 34

    Count I     The Tukey Outlier Deletion Rule is arbitrary and capricious as
               applied to Alignment..............................................................34

    Count II    CMS has unconstitutionally delegated governmental authority.............. 35

    Count III   CMS's methodology for calculating Star Ratings for CAHPS
              measures is arbitrarily biased in favor of larger contracts ......................37

    Count IV   Errors in the administration of the CAHPS survey with respect
              to Alignment's Spanish-speaking enrollees ............................................37

    Count V    Maximus failed to dismiss a request for reconsideration in
              violation of its own guidelines and CMS's rules ....................................39

    Count VI   Maximus wrongly reversed the denial of Case 1-12757246876 .............40

Prayer for Relief................................................................................................ 41

**INTRODUCTION**

1.     This case concerns the Medicare Advantage and Part D Star Ratings system. It is the seventh challenge in less than a year to CMS's unlawful actions in administering the system. In the prior cases, courts across the country have ruled against CMS on varied grounds, holding that the agency violated its own regulations in determining the 2024 Star Ratings (*SCAN Health Plan v. HHS*, 2024 WL 2815789 (D.D.C. June 3, 2024); *Elevance Health, Inc. v. Becerra*, 2024 WL 2880415 (D.D.C. June 7, 2024)) and handled certain measure-level data for the 2025 Star Ratings contrary to its own guidelines and without adequately considering objections (*UnitedHealthcare Benefits of Texas v. CMS*, 2024 WL 4870771, at *3-*7 (E.D. Tex. Nov. 22, 2024)). In another case, CMS has confessed data errors. *See, e.g.*, Dkt. 25 at ¶ 3, *Centene Corp. v. Becerra*, No. 4:24-cv-01415 (E.D. Mo. Dec. 10, 2024). And the court in *UnitedHealthcare* held further that the agency abdicated its statutory duties by delegating them to a private entity. *See* 2024 WL 4870771, at *7-*9.

2.     In this case, Alignment Healthcare challenges the case-specific application of a recent final rule—the Tukey Outlier Deletion Rule (*Contract Year 2021 Policy and Technical Changes to the Medicare Advantage Program*, 85 Fed. Reg. 33796, 33832-33836 (June 2, 2020))—which CMS began implementing in October 2023 for the 2024 Star Ratings. The Tukey Outlier Deletion Rule requires CMS to remove such outliers from its raw data before calculating the Star Ratings for a given year, ostensibly to "stabilize" the Star Ratings and "prevent large year-to-year fluctuations." *See id.* at 33833. But as Alignment explained in its comments at the time, the Rule is based on objectively bad data science, and it produces arbitrary and capricious results. Although relatively simple adjustments would fix the Rule as applied to Alignment, CMS has refused.

3.     Beyond application of the Tukey Outlier Deletion Rule, Alignment challenges CMS's calculation of the company's 2025 Star Ratings. Setting aside CMS's unconsti-

tutional delegation of its regulatory authority to a private entity—a systemic defect that requires vacatur and recalculation of all 2025 Star Ratings—CMS and its contractors made three significant mistakes in their handling of Alignment's data.

4.   First, the rate of Spanish-language responses to the Consumer Assessment of Healthcare Providers and Systems (CAHPS) family of surveys showed a marked and unexplained decline for two Alignment contracts. The two most natural explanations for the declines are that Spanish-speaking enrollees were erroneously sent survey questionnaires in English rather than Spanish (an error by either CMS or its approved survey contractor), or CMS committed a sampling error in administering the CAHPS survey, which is a kind of mistake it has a history of making. Either way, the scores for CAHPS measures were adversely impacted, reducing Alignment's 2025 Star Ratings.

5.   Second, CMS's contractor for claim appeals failed to follow its own policy manual and CMS guidance in the handling of a request for reconsideration. Rather than dismissing the request (as required under the circumstances), the contractor instead reached the merits of the request and ruled for Alignment. While that may seem a favorable outcome for Alignment, it was not. If the contractor had dismissed the reconsideration request as required, Alignment would have had 100% performance on the "Plan Makes Timely Decisions about Appeals" measure for contract H3443, receiving 5.0 Stars on that highly-weighted measure. But because the contractor instead wrongly resolved the request on its merits, Alignment's measure-level raw score fell to 94.4% (it had 17 of 18 appeals timely resolved), and its measure-level Star Rating thus fell to 3.0 Stars.

6.   Third, the same contractor wrongly overturned a claim denial involving an enrollee that had other primary health insurance. CMS's contractor did not disagree that the claim should have been denied as a substantive matter but faulted Alignment for not

coordinating coverage with the other insurer. Yet Alignment had done exactly that, and CMS's contractor was simply wrong to imply otherwise.

7.    The outcomes on these latter two points are arbitrary in their own rights. But in addition, they show why application of the Tukey Outlier Deletion Rule here is arbitrary and capricious. Because of the relatively low number of appeals under Contract H3443 (a good thing, one would think), Alignment had no opportunity to earn 4.0 Stars; rather, a single incident pushed Alignment from 5.0 Stars straight to 3.0 Stars on two different measure scores. They also show why CMS's delegation of regulatory authority to a contractor is so problematic—Alignment had no meaningful opportunity to seek CMS's independent review of or judgment upon the private entity's incorrect decisions.

8.    Star Ratings are tremendously important to the operation of the Medicare Advantage and Part D programs. They provide the public with critical information about a plan's quality, enabling them to compare plans when shopping during the annual enrollment period. They also enable plans to offer richer benefits packages, while keeping costs low for beneficiaries. "CMS is also obligated by statute to offer additional funding to plans with better Star Ratings," and the funds must be used to "lower costs for [Medicare] beneficiaries or to provide them with additional benefits." *SCAN*, 2024 WL 2815789, at *1. This additional funding amounts to tens or hundreds of millions of dollars per contract. "The upshot is that Star Ratings are quite important for private Medicare plans." *Id.*

9.    But CMS's error-prone, lackadaisical approach to the Star Ratings does not appropriately reflect their importance to the MA program. Like all stakeholders connected to the program, Alignment counts on CMS to administer Star Ratings in a consistent, transparent, and rational manner. Alignment has been recognized consistently for its high-quality Medicare Advantage plans—a fact well reflected in the company's Star Ratings when the Star Ratings system is working as it should. Even now, 98% of Alignment's

members are enrolled in plans rated 4.0 Stars or higher, and the company is one of the very few Medicare Advantage organizations with a 5.0 Star plan.

10.    Notwithstanding its industry-leading performance, Alignment brings this suit because the Star Ratings system no longer can be counted on to produce rational, predictable results. The Star Ratings system cannot work if CMS is allowed to promulgate rules based on bad data science, outsource the bulk of its work to unaccountable private entities, and turn a blind eye to data errors that arbitrarily disadvantage smaller Medicare Advantage organizations like Alignment. Vacatur of Alignment's 2025 Star Ratings, and a remand for recalculation of the Star Ratings consistent with law, is thus in order.

## JURISDICTION AND VENUE

11.    This action arises under the APA, 5 U.S.C. §§ 702, 704; and the Declaratory Judgment Act, 28 U.S.C. § 2201. The Court's subject-matter jurisdiction is invoked under 28 U.S.C. § 1331.

12.    Venue is proper in this District under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States, and one of the defendants resides in this District.

## PARTIES

13.    Alignment Healthcare, Inc. has its principal place of business in Orange, California. Alignment sponsors MA plans, using advances in technology to provide customized health care designed to meet the needs of a diverse array of seniors.

14.    The U.S. Department of Health and Human Services is a cabinet-level agency within the United States government. Xavier Becerra, sued in his official capacity, is the Secretary of HHS. Congress has assigned HHS ultimate responsibility for administering the Medicare Advantage and Medicare Part D programs.

15.    HHS has delegated authority to administer the Medicare Advantage and Medicare Part D programs to CMS, an agency within HHS. *See Statement of Organization, Functions and Delegations of Authority*, 66 Fed. Reg. 35437 (July 5, 2001). Defendant Chiquita Brooks-LaSure, sued in her official capacity, is Administrator of CMS. CMS manages the Star Ratings system and issued the 2025 Star Ratings determination and the regulations that are the final agency actions challenged in this case.

## STATUTORY AND REGULATORY BACKGROUND

### A.    The Medicare Advantage and Medicare Part D programs

16.    The Medicare program is the federal health insurance program for people aged 65 or older or with certain disabilities or end-stage renal disease. *See Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4588 (Jan. 28, 2005); 42 U.S.C. § 1395kk(a).

17.    Medicare comprises Parts A, B, C, and D. *See* 70 Fed. Reg. at 4589. Part A covers inpatient hospital treatment, and Part B covers outpatient services. Together, they are known as "traditional" or "original" Medicare. Traditional Medicare use a fee-for-service payment model. *See* 42 U.S.C. § 1395w-22(a)(1). CMS thus reimburses providers directly for the services they provide to traditional Medicare beneficiaries. *UnitedHealth-care Insurance v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021).

18.    Medicare Part C, also known as Medicare Advantage (MA), uses a different model. *See* Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified at 42 U.S.C. §§ 1395w-21 to 1395w-28). In Part C, private companies called MA organizations, or MAOs, offer plans. These companies must cover at least the same services that Medicare beneficiaries would receive through traditional Medicare. 42 U.S.C. § 1395w-22(a). But to attract enrollees, MA plans typically

include additional benefits not covered by traditional Medicare, such as dental and vision benefits. *UnitedHealthcare*, 16 F.4th at 872.

19.     Under this public-private partnership model, MAOs do not receive fee-for-service reimbursements from CMS for the healthcare services their enrollees receive. *See generally* 42 U.S.C. § 1395w-23(a). Instead, they receive a per-enrollee monthly payment to provide coverage for all Medicare-covered benefits to the beneficiaries enrolled in their plan. *Id.* In turn, MAOs pay healthcare providers for the services they provide to MA enrollees. *Id.* § 1395w-23(a)(1).

20.     CMS determines a plan's monthly payment by comparing the plan's "bid" (its estimated cost of providing Medicare-covered services to a particular patient population) to a "benchmark" (the maximum amount the federal government will pay to provide coverage in the plan's service area). *Id.* § 1395w-23(b)(1)(B), (n). If the MAO's bid is below the benchmark, CMS pays the MAO its bid, while returning a specified percentage of the difference between the benchmark and the bid as a "rebate," which the MAO must use to provide additional benefits or otherwise return to plan participants through lower premiums or cost sharing. 42 U.S.C. §§ 1395w-23(a)(1)(B)(i), (E); 1395w-24(b)(1)(C).

21.     If, in contrast, an MAO's plan bid is at or above the benchmark, the MAO receives monthly payments at the benchmark rate, and the MAO must charge enrollees an additional premium to cover the amount by which the bid exceeds the benchmark. *Id.* §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A). *See also Medicaid & Medicare Advantage Products Association of Puerto Rico v. Emanuelli Hernández*, 58 F.4th 5, 8 n.1 (1st Cir. 2023); *Elevance*, 2024 WL 2880415, at *2.

22.     In addition to inpatient treatment and outpatient services through traditional Medicare or MA, Medicare beneficiaries may also obtain prescription drug coverage through Medicare Part D. Like the MA program, the Part D prescription drug benefit

provides coverage through a public-private partnership with plan sponsors. These plan sponsors offer both standalone prescription drug plans (PDPs) for individuals enrolled in traditional Medicare and drug coverage bundled with an MA plan, known as an MA-PD plan. 42 U.S.C. § 1395w–101(a)(1), (3)(C).

23.    Since their adoption in 2003, the MA and Part D programs have grown steadily. Americans prefer the choices that MA plans provide compared with traditional Medicare. The immediate predecessor to MA, called Medicare+Choice, had approximately 1.56 million enrollees in 1992. *See* CMS, *Medicare Managed Care Contract (MMCC) Plans Monthly Report*, perma.cc/YPK6-DDEW (click Live View). By 2023, that figure had increased to more than 30 million enrollees, surpassing for the first time the number of beneficiaries opting for traditional Medicare. Nancy Ochieng, et al., *Medicare Advantage in 2023: Enrollment Update and Key Trends* (Aug. 9, 2023), perma.cc/EYE2-4UHR. And the Congressional Budget Office recently projected that 62% of Medicare beneficiaries would be enrolled in MA by 2033. *Id.*

### B.    The Star Ratings system and score calculations

24.    Each MAO is required to establish "ongoing quality improvement program[s]." 42 U.S.C. § 1395w-22(e)(1), (3). The MA statute prescribes a system of "quality rating[s]" for plans with a "5-star rating system," based on the data collected under MAOs' quality improvement programs. *Id.* § 1395w-23(o)(4)(A).

25.    To implement this statutory mandate, and to assist would-be enrollees in choosing the plans best suited to their needs, CMS established the Star Ratings system early in the MA program's existence. Star Ratings purport to measure the quality of health and drug plans and provide comparative information to beneficiaries. *See* 42 C.F.R. §§ 422.160(b)(1), 423.180(b)(1).

26.    CMS considers up to 40 distinct "measures" of a plan's quality to derive the plan's Star Ratings from year to year.

27.    Broadly speaking, CMS breaks those measures into two categories. The first category includes data concerning plan performance reported by the MAO or generated by CMS or its subcontractors. These data reflect such issues as the plan's success in delivering preventive care like cancer screenings, the health outcomes of plan participants with respect to such conditions as blood pressure, and the quality of plan administration measured by such factors as the speed with which it pays claims and resolves appeals.

28.    The second category of measures rely on data drawn from a family of patient-experience surveys, known as the Consumer Assessment of Healthcare Providers & Systems (CAHPS) surveys. The CAHPS surveys—which are written by CMS and administered by CMS-approved contractors working directly with MAOs—ask enrollees (and in some cases their families) about their experiences with, and ratings of, their health care providers and plans. The CAHPS surveys ask MA enrollees about a range of issues, including the timeliness of care, quality of doctor-patient interactions, accuracy and timeliness of plan billing, and enrollees' overall satisfaction with their MA plan and healthcare.

29.    CMS develops ratings on a five-star scale based on these measures. *See* 42 C.F.R. §§ 422.166(a)(4), 423.186(a)(4). A 1.0 Star Rating is the worst rating, and 5.0 Star Rating is the best. *Id*. §§ 422.166(a)(4), (c)(3), (d)(2)(iv), 423.186(a)(4), (c)(3), (d)(2)(iv). The system is intended to reflect the quality and performance of each plan. *Id*. §§ 422.160(b)(1), 423.180(b)(1); *see also Elevance*, 2024 WL 2880415, at *2.

30.    Star Ratings are based on the scores that these plans earn on various quality and performance "measures." *See* 42 C.F.R. §§ 422.162(a), 423.182(a). CMS first deter-mines each plan's raw scores on each measure. It then converts the raw scores into

measure-level Star Ratings, and from there calculates each plan's overall Star Rating by running a weighted average of all measures. *See SCAN*, 2024 WL 2815789, at *1-*2.

31.     The measure-level ratings fall in five categories: (1) outcome measures, which address improvements in a beneficiary's health; (2) intermediate outcome measures, which address actions taken which can assist in improving a beneficiary's health status; (3) patient experience measures, which address beneficiaries' perspectives of the care they received; (4) access measures, which address whether the plan creates barriers to beneficiaries receiving needed care; and (5) process measures, which capture the health care services provided to beneficiaries that can assist them in maintaining, monitoring, or improving their health status. *See* CMS, *Medicare 2025 Part C & D Star Ratings Technical Notes* 1 (Oct. 3, 2024) (*2025 Technical Notes*), perma.cc/RN8H-RAWA; *Contract Year 2019 Changes to the Medicare Advantage and Medicare Prescription Drug Benefit Programs*, 83 Fed. Reg. 16440, 16532 (Apr. 16, 2018).

32.     Each plan receives a numerical score for each applicable measure, which CMS converts into a "measure-level" Star Rating on a five-star scale. The scale uses four thresholds, or "cut points," to divide the measure scores into five "whole star increments." 42 C.F.R. §§ 422.166(a)(4), 423.186(a)(4).

33.     From the measure-level Star Ratings, CMS calculates Part C and Part D "summary" ratings, which reflect the weighted mean of a contract's measure-level Star Ratings, with some measures counting more than others. *Id.* §§ 422.166(c), 423.186(c). CMS further calculates an overall rating for each MA-PD contract, which reflects the weighted mean of that contract's Part C and Part D measure-level Star Ratings.

### C.     The purpose and effect of the Star Ratings system

34.     The Star Ratings systems serves three purposes, each of which requires the ratings to "accurately . . . reflect true performance." 83 Fed. Reg. at 16519.

35.    First, the system is designed to provide Medicare beneficiaries with "comparative information on plan quality and performance," allowing them to make "knowledgeable enrollment and coverage decisions in the Medicare program." 42 C.F.R. §§ 422.160-(b)(1), 423.180(b)(1). As CMS has explained, the "MA and Part D Star Ratings system is designed to provide information to the beneficiary that is a true reflection of the plan's quality and encompasses multiple dimensions of high-quality care," with the goal of "inform[ing] plan choice" by beneficiaries. 83 Fed. Reg. at 16520.

36.    To this end, CMS prominently displays Star Ratings in its online and print resources concerning available MA plans. Through the online Medicare Plan Finder tool, which provides information to beneficiaries about available plans, CMS displays MA plans to prospective enrollees in order of highest to lowest Star Ratings to guide beneficiaries to higher-rated plans first. Medicare beneficiaries use the Star Ratings to assess the quality of the MA plans; and agents and brokers use the Star Ratings in assisting beneficiaries in selecting a plan that fits their health care needs. *Elevance*, 2024 WL 2880415, at *2.

37.    Star Ratings thus influence each plan's position in the marketplace, by affecting how prospective enrollees perceive the comparative quality of various plans. For instance, MA-only plans with a 5.0 Star Part C summary rating and Part D plans with a 5.0 Star Part D summary rating are displayed with a high-performing icon, while a plan that had any combination of Part C or Part D summary ratings of 2.5 Stars or lower in the most recent three consecutive years is marked with a "low performance" icon. *See* 42 C.F.R. §§ 422.166(h), 423.186(h).

38.    Second, the system is designed to help CMS perform "oversight, evaluation, and monitoring of MA and Part D plans" (83 Fed. Reg. at 16520-16521) and their compliance with regulatory and contract requirements. 42 C.F.R. §§ 422.160(b)(3), 423.180-(b)(3).

39.    The Star Ratings program's third, more recent, purpose is to provide "quality ratings on a 5-star rating system" to be used in administering the scheme of additional payments for high quality MA plans, known as quality bonus payments (QBPs). The QBP system was established in 2010 by the Patient Protection and Affordable Care Act (ACA). *See* 42 C.F.R. § 422.160(b)(2); *Proposed Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2012*, 75 Fed. Reg. 71190, 71218 (Nov. 22, 2010).

40.    The ACA provides that an MA plan is entitled to QBPs from CMS depending on the "quality rating" of the plan, which "shall be determined according to a 5-star rating system." 42 U.S.C. § 1395w-23(e)(4)(A). Thus, if an MA plan receives a Star Rating of 4.0 Stars or higher, its benchmark amount is increased, in turn increasing either the per-month payment from CMS or the rebates that CMS will pay by increasing the difference between the MAO's benchmark and its bid. *Id.* § 1395w-23(o)(1), (3)(A).

41.    Star Ratings also determine the portion of the difference that is returned as a rebate. 42 C.F.R. §§ 422.162(b)(2), 423.182(b)(2). Plans with a 4.5 Star Rating or higher receive 70% of the difference between the benchmark and the bid; plans with a Star Rating between 3.5 and 4.5 Stars receive a 65% rebate, and plans with a Star Rating under 3.5 Stars receive a 50% rebate. 42 U.S.C. § 1395w-24(b)(1)(C)(v); 42 C.F.R. § 422.266(a)(2)(ii).

42.    The Star Ratings system is intended to reflect each plan's ability to provide quality care and benefits to its enrollees. It also affects the compensation that MAOs receive for the plans they sponsor. Moreover, regulations permit beneficiaries to change plans any time during the year, but only if the plan into which they move is a 5.0 Star plan. 42 C.F.R. § 422.62(b)(15). Star Ratings also drive whether a low-performing plan remains eligible to continue to participate in the program. *See id.* §§ 422.502(b), 423.503(b).

43.    CMS annually reviews the "accuracy, reliability, and validity" of measures, removing measures from the Star Ratings program if they are not sufficiently accurate and reliable. *Id.* §§ 422.164(b), 23.184(b).

### D.    Non-CAHPS measures and the Tukey Outlier Deletion Rule

44.    For non-CAHPS measures—those based on data reported by MAOs or generated by CMS and its contractors—the agency converts raw measure scores into measure-level Star Ratings using a clustering methodology. 42 C.F.R. §§ 422.166(a)(2); 423.186(a)(2). The clustering methodology "identifies the natural gaps that exist within the distribution of the scores" and creates five non-overlapping "groups (clusters)" among the scores that correspond to the five whole-star increments in the measure-level Star Rating. *2025 Technical Notes*, at 143. Clustering is a statistical technique used to partition a dataset into distinct groups, such that the observations within a group are as similar as possible to each other, and as dissimilar as possible to observations in any other group. *See* 42 C.F.R. § 422.162(a); 83 Fed. Reg. at 16525.

45.    Beginning with the 2024 Star Ratings, the first step of the clustering methodology to convert non-CAHPS measure scores into measure-level Star Ratings has been to remove "Tukey outer-fence outliers" from the raw scores for a given measure. 42 C.F.R. §§ 422.166(a)(2)(i), 423.186(a)(2)(i). This is a statistical technique used to "identify and remove extreme outliers in a dataset." *Elevance*, 2024 WL 2880415, at *5.

46.    Once outlier deletion is done, CMS applies mean resampling uses a clustering methodology to sort the measure scores into groups. 42 C.F.R. §§ 422.166(a)(2)(i), 423.186(a)(2)(i). The "dividing lines" between the groups establish the Star Rating "cut points" for that measure. The cut points are the numerical values at which "a score results in a higher or lower star rating." *See SCAN*, 2024 WL 2815789, at *2; *Elevance*, 2024 WL 2880415, at *4.

47.    As a final step, CMS applies a "guardrail" that caps any year-to-year change in a given cut point at five percent. 42 C.F.R. §§ 422.166(a)(2)(i), 423.186(a)(2)(i).

48.    A plan's measure-level Star Rating for a given measure depends on where the plan's numerical measure score falls relative to the guardrail-capped cut points. Because the measure-level Star Ratings are based on "whole star increments" (*id*. §§ 422.166(a)(4), 423.186(a)(4)), a change of even one percent in the cut points can lead to a whole-star drop in a plan's Star Rating.

### E.    The CAHPS surveys

49.    For measures derived from enrollee responses to the CAHPS surveys, CMS uses a method that "combines evaluating the relative percentile distribution" of a plan's score, together with "significance" and "reliability" testing, to convert the raw numerical scores into measure-level Star Ratings. 42 C.F.R. §§ 422.166(a)(3); 423.186(a)(3). A measure-level CAHPS Star Rating is thus a function of a plan's raw performance relative to other plans, adjusted for the "significance" and "reliability" of the underlying data. *Id*.

50.    To be eligible to participate in a CAHPS survey, a plan participant must be enrolled in the contract continuously for at least six months. *See* CMS, *Quality Assurance Protocols & Technical Specifications, Version 14.1* 17 (Nov. 2023) (*Protocols & Specifications*), https://perma.cc/F8J8-GJNZ.

51.    For MA contracts with greater than 800 CAHPS-eligible enrollees, CMS samples 800 eligible enrollees. For MA contracts with between 600 and 799 eligible enrollees, CMS samples all eligible enrollees. If a contract has fewer than 600 eligible enrollees, it is not required to field the CAHPS surveys. If a contract does not field the surveys, the CAHPS measures do not factor into the contract's Star Ratings. *Id*.

52.    CMS allows contracts with greater than 800 CAHPS-eligible enrollees to oversample at their own expense, provided "there is sufficient eligible enrollee volume to

support additional sampl[ing]." *Id.* at 18. Some larger contracts—many with tens or hundreds of thousands of enrollees—will oversample by an order of magnitude.

53.    The larger the number of respondents a survey receives, the greater "significance" CMS will assign to the contract's measure-level mean score. In this way, CMS's allowance of oversampling confers a substantial advantage on larger contracts. A contract with one measure-level mean score and reliability rank may earn a higher measure-level Star Rating than a contract with the same mean score and reliability rank if it oversamples and thereby obtains a greater significance score.

54.    CMS does not itself administer the CAHPS surveys. It instead directs MAOs to work with any one of a number of approved survey vendors to administer the surveys. Vendors transmit results to CMS and must comply with CMS's protocols. *See id.* at 8.

55.    CMS provides approved survey vendors with translations of the CAHPS surveys and supporting materials so the surveys can be administered in languages other than English, including Spanish. *See id.* at 32-33, 50; *accord* CMS, *MA & PAP CAHPS Survey Vendor Training* 100 (Nov. 2024) (*Training*), perma.cc/Y695-7R2X.

56.    Vendors are required to make Spanish-language questionnaires available to all Spanish-speaking enrollees. *Protocols & Specifications* 50-51; *Training* 100. If an MA plan requests it, the vendor must send Spanish-language questionnaires to enrollees identified using language preference data provided by the MA plan. *Protocols & Specifications* 50-51; *Training* 101. The decision whether to send Spanish-language questionnaires to identified enrollees is the plan's decision, not the vendor's. *Protocols & Specifications* 50.

57.    The Star Rating awarded to a contract for a CAHPS measure depends on the reliability of the contract's measure score. 42 C.F.R. §§ 422.166(a)(3), 423.186(a)(3). Reliability is a statistical property defined in this context as "the fraction of the variation among the observed measure values that is due to real differences in quality ('signal')

14

rather than random variation ('noise')." *Id.* § 422.162(a). It is reflected in a scale from 0 (where all differences in measure scores are due to measurement error) to 1 (where all differences in measure scores are due to real differences in quality and performance). *Id.*

58.    Where the reliability of a CAHPS measure is less than 0.60, it is designated a "very low reliability" measure (*2025 Technical Notes*, at 194), and "no measure Star Rating is produced." 42 C.F.R. § 422.166(a)(3); *see 2025 Technical Notes*, at 160.

59.    Because numerical measure scores are converted to measure-level Star Ratings with "whole star increments" (42 C.F.R. §§ 422.166(a)(4), 423.186(a)(4)), even minute fluctuations in CAHPS data can change a contract's base group assignment and lead to a whole-star change in the contract's Star Rating on that measure.

### F.    Reconsideration of coverage determinations and IRE review

60.    Each MAO must maintain a "procedure for making [coverage] determinations." 42 U.S.C. § 1395w-22(g)(1)(A). Each is also required to "provide for reconsideration" of its adverse coverage determinations "upon request by the enrollee involved." *Id.* § 1395w-22(g)(2)(A). The statute contemplates further review by an independent entity of MAOs' decisions regarding reconsideration requests, directing CMS to "contract with an independent, outside entity to review and resolve in a timely manner reconsiderations that affirm denial of coverage, in whole or in part." *Id.* § 1395w-22(g)(4).

61.    CMS regulations expand the parties who can request for reconsideration of an MAO's coverage determinations. Not only the enrollee seeking coverage of a health service, but also the "physician who is treating" the enrollee and acting on the enrollee's behalf, provided notice is given to the enrollee, may ask for a reconsideration of an MAO's initial determination denying coverage. 42 C.F.R. §§ 422.578, 422.582(a).

62.    CMS refers to reconsideration by MAOs of an initial determination to deny coverage as a "level 1 appeal." CMS, *Parts C & D Enrollee Grievances, Organization/Cover-*

*age Determinations, and Appeals Guidance* 6 (Nov. 18, 2024) (*Appeals Guidance*). https://perma.cc/5AHF-FKNF.

63.    In compliance with the statutory mandate (*see* 42 U.S.C. § 1395w-22(g)(4)), CMS regulations provide that when an MAO's decision regarding a reconsideration request "affirms, in whole or in part, its adverse [coverage] determination," then "the issues that remain in dispute must be reviewed and resolved by an independent, outside entity that contracts with CMS" (42 C.F.R. § 422.592(a)). The independent, outside entity is called the independent review entity, or IRE.

64.    CMS guidance instructs that if an MA plan makes an untimely decision on a level 1 appeal, or if it affirms (in whole or in part) its initial adverse coverage determination, the plan must forward the appeal to the IRE for review within a specified timeframe. *See Appeals Guidance* 79, 81-83.

65.    The IRE for the MA program is Maximus Federal Services. When Maximus rules against a provider or beneficiary, the provider or beneficiary has a right to administrative review before an administrative law judge pursuant to 42 U.S.C. § 405(b). When Maximus rules against an MAO, the plan has no right to administrative review, and the decision is final.

66.    Once Maximus has reviewed the MAO's decision regarding a reconsideration request, it makes a "reconsidered determination." 42 C.F.R. § 422.594(a). This "reconsidered determination is final and binding on all parties, unless a party *other than the MA organization* files a request for [an ALJ] hearing" or it is reopened and revised by Maximus. *See id.* § 422.616 (emphasis added).

67.    In addition, if an MAO "dismisses a request for a reconsideration" because it determines that the request is procedurally defective (*id.* § 422.582(f)), the enrollee or the

16

treating physician "has the right to request review of the dismissal by the independent entity" (*id.* § 422.590(i); *see also id.* § 422.592(a)).

68.   Upon review, Maximus may dismiss the request for reconsideration, and such dismissal "is binding and not subject to further review" unless a party files a request for a hearing before an administrative law judge (ALJ), or Maximus later vacates its own dismissal. *Id.* § 422.592(g). By regulation, however, an MAO has no right to request an ALJ hearing. *Id.* § 422.600. If Maximus "determines that the [MAO's] dismissal was in error," it must "vacate[] the dismissal and remand[] the case to the plan for reconsideration." *Id.* § 422.592(i). Maximus's decision regarding the MAO's dismissal determination "is binding and not subject to further review." *Id.*

69.   CMS also refers to the Maximus review process as a "level 2 appeal." CMS, *Appeals Guidance*, at 6.

70.   Two measures—the "Plan Makes Timely Decisions about Appeals" measure and the "Reviewing Appeals Decisions" measure—track plan performance in relation to level 1 and level 2 appeals.

71.   CMS guidance explains that the "Plan Makes Timely Decisions about Appeals" measure "shows how fast a plan sends information for an independent review," using as its metric the "[p]ercent of [level 1] appeals timely processed by the plan . . . out of all the plan's appeals decided by the Independent Review Entity (IRE)," including "upheld, overturned, partially overturned appeals" and appeals not evaluated by the IRE because the plan agreed to cover the underlying claim. *2025 Technical Notes*, at 75. However, "[d]ismissed appeals . . . are excluded from this measure." *Id.*

72.   The "Reviewing Appeals Decisions" measure "shows how often an independent reviewer found the health plan's decision to deny coverage to be reasonable." *Id.* at 76. The metric tracked by this measure is the "[p]ercent of [level 1] appeals where a plan's

decision was 'upheld' by the Independent Review Entity (IRE) . . . out of all the plan's appeals . . . that the IRE reviewed." *Id*. at 77.

**G.    Plan sponsor participation in Star Ratings (plan preview periods)**

73.    Given the importance of Star Ratings to the MA program, and the sensitivity of the system to erroneous or unreliable data, CMS's regulations establish an administrative process through which MAOs and other plan sponsors can review and comment on, and challenge the adequacy of, the agency's preliminary calculations. The regulations call this administrative process the "plan preview" periods: "CMS will have plan preview periods before each Star Ratings release during which MA organizations can preview their Star Ratings data in HPMS prior to display on the Medicare Plan Finder." 42 C.F.R. § 422.166(h)(2); *see also id*. § 423.186(h)(2). HPMS is CMS's Health Plan Management System, a website used to facilitate communications between CMS and MAOs. *See* https://bit.ly/49Unhfq.

74.    The plan preview process is the only administrative process available to a plan permitting it to comment on and participate in the Star Ratings process before Star Ratings are finalized and published by CMS.

75.    CMS holds two preview periods. During the first plan preview, CMS "expect[s]" MAOs to "closely review the methodology and their posted numeric data for each measure." 83 Fed. Reg. at 16588. During the second plan preview, CMS will post to the System "any revisions made as a result of the first plan preview," as well as the "preliminary Star Ratings for each measure, domain, summary score, and overall score." *Id*. CMS again "expect[s]" plan sponsors to "closely review the methodology and their posted data for each measure, as well as their preliminary Star Rating assignments." *Id*.

76.    A core purpose of the plan preview process is data validation. The two plan previews allow "sponsors to review and raise any questions about their own plan's data

prior to the public release of data for all plans," so that if there are any errors, "necessary corrections" can be made prior to the Star Ratings being announced to the public. *Id.*

77.    The plan preview process reflects CMS's position that, for the Star Ratings to be a "true reflection of the quality, performance and experience of the beneficiaries enrolled in MA and Part D contracts," the data and analysis underlying measure scores and measure-level Star Ratings must be "complete, accurate, and unbiased." *Id.* at 16567. Because of the importance of data accuracy, "[d]ata validation is a shared responsibility among CMS, CMS data providers, contractors, and Part C and D sponsors." *Id.* at 16562.

78.    CMS imposes harsh penalties on MAOs for submitting inaccurate data. For example, CMS will "reduce a contract's measure rating when CMS determines that" the data reported to it "are inaccurate, incomplete, or biased," which can result from "mis-handling" and "inappropriate processing" of data. 42 C.F.R. §§ 422.164(g)(1), 423.184(g)(1). For measures based on data that an MAO must submit to CMS, the rating will be reduced to 1 Star when a contract "was not compliant with CMS data validation standards." *Id.* §§ 422.164(g)(1)(ii), 423.184(g)(1)(ii).

## FACTUAL ALLEGATIONS

### A.    Application of the Tukey Outlier Deletion Rule to small-denominator non-CAHPS measures produces arbitrary results

79.    To justify the addition of Tukey outlier deletion as a step in the method by which non-CAHPS measure scores are converted into measure-level Star Ratings, CMS explained in the preamble to the final rule that it would enhance the "stability" and "pre-dictability" of Star Ratings, "while maintaining the intent of the cut point methodology to accurately reflect true performance." 85 Fed. Reg. at 33832.

80.    CMS raised concerns that "extreme outliers" were unduly "influencing cut point determinations," and it adopted the Tukey outlier deletion method as "an approach

to identify and remove outliers prior to clustering contract scores to determine cut points for assigning measure stars." *Id.* at 33833. The agency's stated "main objective" in introducing Tukey outlier deletion was to "stabilize cut points and prevent large year-to-year fluctuations in cut points caused by the scores of a few contracts." *Id.*

81.    An analysis of the impact of the Tukey method revealed that implementing the Tukey outlier deletion method would cause the cut points for seven measures to shift upwards substantially. Of these seven measures, five are heavily weighted measures and therefore "have a very large impact on the overall Star Ratings." *See* Alignment Comment Letter 8-9. The table below demonstrates the point:

| Measure | | | Actual RY 2023 Released Cut points | | | | Simulated RY 2023 Tukey Cut points | | | | Difference between Actual and Simulation Cut points | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name | Type | Weight | 1 to 2 Stars | 2 to 3 Stars | 3 to 4 Stars | 4 to 5 Stars | 1 to 2 Stars | 2 to 3 Stars | 3 to 4 Stars | 4 to 5 Stars | 1 to 2 Stars | 2 to 3 Stars | 3 to 4 Stars | 4 to 5 Stars |
| *Call Center – Foreign Language Interpreter and TTY Availability (C28)* | Admin | 4 | 36 | 59 | 83 | 94 | 76 | 82 | 89 | 95 | +40 | +23 | +6 | +1 |
| *Call Center – Foreign Language Interpreter and TTY Availability (D01)* | Admin | 4 | 30 | 64 | 80 | 91 | 68 | 81 | 91 | 97 | +38 | +17 | +11 | +6 |
| *Complaints about the Health/Drug Plan (C23/D02)* | Admin | 4 | 1.53 | 0.89 | 0.5 | 0.19 | 0.68 | 0.43 | 0.25 | 0.12 | -56% | -52% | -50% | -37% |
| *Plan Makes Timely Decisions about Appeals (C26)* | Admin | 4 | 59 | 75 | 85 | 97 | 89 | 93 | 97 | 100 | +30 | +18 | +12 | +3 |
| *Reviewing Appeals Decisions (C27)* | Admin | 4 | 68 | 83 | 91 | 97 | 84 | 90 | 95 | 98 | +16 | +7 | +4 | +1 |
| *Diabetes Care – Blood Sugar Controlled (C11)* | HEDIS | 3 | 39 | 62 | 75 | 83 | 63 | 72 | 80 | 86 | +24 | +10 | +5 | +3 |
| *Care for Older Adults – Medication Review (C06)* | HEDIS | 1 | 43 | 70 | 82 | 93 | 73 | 82 | 91 | 96 | +30 | +12 | +9 | +3 |

82.    For example, the simulated 2023 cut points for the "Plan Makes Timely Decisions about Appeals" measure showed that, with the Tukey outlier deletion method, the values for the cut points from 2 to 3 Stars, from 3 to 4 Stars, and from 4 to 5 stars would all increase dramatically, making it substantially more difficult for plans to achieve higher measure-level Star Ratings for the same level of performance.

83.    In the preamble to the final rule, CMS confirmed that its own simulation predicted that certain cut points would experience "significant changes to the thresholds." *See Contract Year 2024 Policy and Technical Changes to the Medicare Advantage Program*, 88 Fed. Reg. 22120, 22296 (Apr. 12, 2023). Thus, as Alignment argued, "Tukey outlier

deletion will *decrease* predictability and stability of cut points" rather than increase it. *Id.* Moreover, the increases in the cut points for the "Plan Makes Timely Decisions about Appeals" measure would mean that "even where contracts show significant improvement in performance, they would see a substantial decline in their Star Ratings on . . . a highly weighted measure." Alignment Comment Letter 10-11.

84.     Alignment showed that the score-spread from one measure-level cut point to the next would be compressed under the Tukey Outlier Deletion Rule, meaning that even slight changes in data could produce major swings in a contract's Star Ratings for that measure, thereby undermining the reliability of measure-level Star Ratings.

85.     When the spread in raw scores from one cut point to the next is too compressed, contracts with small denominators for that score will be treated differently and unfairly. For example, if a 4.0 Star score for a given measure corresponds with a raw score of 97-99%, while a 3.0 Star score corresponds with a raw score of 93-96%, a plan with a measure-level denominator of 11 cannot earn either 4.0 or 3.0 Stars. If it has a perfect score (11/11, or 100%), it will earn 5.0 Stars. But if it has a single error (10/11, or 91%), it will drop to 2.0 Stars. With these hypothetical cut points, it is mathematically impossible for a contract with a denominator of 11 or less to obtain 4.0 or 3.0 Stars—just a single error moves it to 2.0 Stars.

86.     There are two general methods to correct for the compression of measure-level cut points in the Star Ratings system. The first is to eliminate Tukey outlier deletion, which is the source of the compression. The second is calculate a measure-level score using Tukey outlier deletion, but only for those contracts with a denominator large enough to ensure that it is mathematically possible to earn each Star level—1, 2, 3, 4, and 5.

87.     Alignment illustrated how implementing the Tukey method without corresponding adjustments in minimum denominator requirements renders measure-level Star

Ratings unreliable with the example of the "Plan Makes Timely Decisions about Appeals" measure. In the table at the conclusion of this paragraph, the boxes on top reflect actual 2023 cut points; the boxes below reflect the 2023 cut points with Tukey outliers removed. This shows that a contract with a denominator of 11 would earn 5.0 Stars with a perfect performance, but with one untimely appeal, it would fall immediately to 2.0 Stars. A contract with a denominator of 25 and one untimely appeal would fall immediately to 3.0 Stars. Not until the contract had a denominator of 29 would it be mathematically possible to earn 4.0 Stars as a result of one untimely appeal. The data are depicted below:

a)

| 2023 Star Rating Cutpoints | |
|---|---|
| 1 Star | |
| 2 Star | 59 |
| 3 Star | 75 |
| 4 Star | 85 |
| 5 Star | 97 |

| # of untimely appeals | Denominator | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 3 | 5 | 7 | 9 | 11 | 15 | 20 | 25 | 30 |
| 0 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| 1 | 66.7 | 80.0 | 85.7 | 88.9 | 90.9 | 93.3 | 95.0 | 96.0 | 96.7 |
| 2 | 33.3 | 60.0 | 71.4 | 77.8 | 81.8 | 86.7 | 90.0 | 92.0 | 93.3 |
| 3 | 0.0 | 40.0 | 57.1 | 66.7 | 72.7 | 80.0 | 85.0 | 88.0 | 90.0 |

b)

| 2023 Star Rating Cutpoints (\w Tukey) | |
|---|---|
| 1 Star | |
| 2 Star | 89 |
| 3 Star | 93 |
| 4 Star | 97 |
| 5 Star | 100 |

| # of untimely appeals | Denominator | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 3 | 5 | 7 | 9 | 11 | 15 | 20 | 25 | 30 |
| 0 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| 1 | 66.7 | 80.0 | 85.7 | 88.9 | 90.9 | 93.3 | 95.0 | 96.0 | 96.7 |
| 2 | 33.3 | 60.0 | 71.4 | 77.8 | 81.8 | 86.7 | 90.0 | 92.0 | 93.3 |
| 3 | 0.0 | 40.0 | 57.1 | 66.7 | 72.7 | 80.0 | 85.0 | 88.0 | 90.0 |

88.    Alignment warned in its comment letter on the proposed Tukey rule that adopting the Tukey method would undermine the reliability of measure-level Star Ratings, unless the agency adjusted each measure's minimum denominator criterion appropriately. Alignment Comment Letter 12-14. For measure-level Star Ratings to remain reliable, rational, and fair, CMS must adjust upwards the minimum denominator requirement for each non-CAHPS measure. The requirement for each measure must be the lowest denominator at which a contract is able to earn each Star Rating—1, 2, 3, 4, and 5.

89.    CMS acknowledged this issue, noting that "minimum sample size and/or denominator requirements" are one method for "prevent[ing] unreliable data from impact-

ing Star Ratings" and that "ensure[s] measure data are reliable." *Contract Year 2023 Policy and Technical Changes to the Medicare Advantage and Medicare Prescription Drug Benefit Programs*, 87 Fed. Reg. 27704, 27766 (May 9, 2022). CMS similarly recognized that score compression can undermine a measure's reliability, noting that when the scores for a given measure exhibit "decreas[ed] . . . variability across contracts," this "mak[es] the measure unreliable." 83 Fed. Reg. at 16535. But it declined to adjust its minimum denominator requirement.

90.   As Alignment predicted, the Tukey Outlier Deletion Rule, as applied to the 2025 Star Ratings, not only dramatically increased the cut points across multiple measures, but also compressed the spread from one cut point to the next. As a result, the system has become excessively sensitive and unreliable, making it impossible for smaller contracts with low denominators to earn certain measure-level Star Ratings.

91.   For example, after the Tukey Outlier Deletion Rule was implemented and CMS declined to adjust the minimum denominator requirement, the reliability of the "Plan Makes Timely Decisions about Appeals" and "Reviewing Appeals Decisions" measures was compromised for contracts H3443 and H9686.

92.   Contract H3443 had a denominator of 18 appeals, suggesting that relatively few claim determinations were challenged by enrollees or providers. Of those 18, Maximus flagged one as untimely and another as wrongly resolved. On the "Plan Makes Timely Decisions about Appeals" and "Reviewing Appeals Decisions" measures, the contract therefore received a score of 94% (17/18), which caused the Star Ratings for these measures to drop from 5.0 Stars to 3.0 Stars—due to an error on a *single* appeal for each measure.

93.   Similarly, contract H9686 had a denominator of 15 appeals, meaning that it likewise was mathematically impossible for it to have achieved 4.0 Stars one the "Plan Makes Timely Decisions about Appeals" and "Reviewing Appeals Decisions" measures. If

those measures had been excluded from contract H9686's Star Ratings, the contract would have achieved an overall 4.5 Stars rather than 4.0 Stars.

**B.    Unexplained drop in Spanish-language response rates suggest either a sampling error or mistakes in distributing Spanish-language questionnaires**

94.    The data that CMS disclosed during the plan preview periods for the 2025 Star Ratings revealed a sharp decline in Spanish-language response rates to the CAHPS survey for two Alignment contracts, H3815 and H3443, despite a slight year-over-year increase in the percentage of Spanish-speaking enrollees eligible for the CAHPS survey.

95.    For the H3815 contract, the percentage of completed Spanish-language surveys dropped from 31% of overall responses in 2023 to 18% in 2024. For the H3443 contract, it fell from 24% of total responses in 2023 to 16% in 2024. These marked declines in Spanish-language response rates occurred against the backdrop of modest increases for both contracts in the percentage of CAHPS-eligible enrollees who are Spanish speaking: from 27.2% in 2023 to 27.3% in 2024 for the H3815 contract, and from 25.3% to 25.8% for the H3443 contract.

96.    The drops in Spanish-speaking response rates for contracts H3815 and H3443 corresponded with performance declines for multiple CAHPS measures for the same contracts. Both contracts saw reductions in their Star Ratings for these measures from 2024 to 2025.

97.    These results are anomalous. Alignment's CAHPS scores for contracts H4961 and H9686—which are highly similar to contracts H31815 and H3443 in terms of provider network structure, member experience, and member demographics—both showed notable improvements from 2024 to 2025. Alignment has not been able to identify any objective explanation for the differences in performance across these contracts.

98.   The results for contracts H3815 and H3443 are also inconsistent with Alignment's own surveys, which it conducts in parallel with the CAHPS surveys for internal quality assurance purposes. Alignment's parallel surveys consistently show industry-leading member satisfaction. That is especially true among its Spanish-speaking members, who report approximately 10% *higher* satisfaction rates compared with English-speaking members. And contracts H3815 and H3443 have the highest number of Spanish-speaking members among all of Alignment's contracts.

99.   Alignment has identified two possible explanations for the significant and unexplained declines in the Spanish-language CAHPS survey response rates and scores for the H3815 and H3443 contracts. First, CMS may have committed a sampling error, resulting in under-sampled Spanish-speaking enrollees for those two contracts. Second, the CMS-approved survey vendor may have erroneously distributed English-language CAHPS survey questionnaires to Alignment's Spanish-speaking members.

100.   The second explanation is particularly plausible because research shows that Spanish speakers not only respond at a lower rate when queried in English, but also give less positive answers when they do respond. *See* Floyd J. Fowler Jr. et al., *How Responding in Spanish Affects CAHPS Results*, 22 BMC Health Services Research 884 (2022).

101.   Simply put, if a contract's Spanish-speaking enrollees are surveyed in English instead of Spanish, the response rate will decline and the scores for the responses given will decline. That is what happened for the H3815 and H3443 contracts on several measures for the 2025 Star Ratings.

102.   Upon information and belief, if the CAHPS survey responses from Spanish-speaking enrollees in the H3815 and H3443 contracts had not been depressed by either a sampling error or survey distribution error, the measure-level Star Ratings for many CAHPS measures would have improved.

25

103.   The lower response rates among Alignment's Spanish-speaking enrollees furthermore impacted the reliability scores for "Getting Care Quickly" and "Care Coordination" measures for contracts H3815 and H3443.

104.   By regulation, "no measure Star Rating is produced if the reliability of a CAHPS measure is less than 0.60." 42 C.F.R. § 422.166(a)(3). CMS's rules for the Star Ratings system designate any CAHPS measure with less than a 0.60 reliability score as "Very Low Reliability." *2025 Technical Notes*, at 189.

105.   The "Getting Care Quickly" measure is calculated using two questions, one of which was labeled as having "Very Low Reliability" for both contracts. Similarly, the "Care Coordination" measure had four of six total questions flagged as having "Very Low Reliability" for both contracts. This demonstrates that the majority of the data used in calculating these measures for these contracts was based on generally unreliable inputs, raising significant concerns about the validity of these results.

106.   During the 2025 plan preview periods, Alignment obtained reliability scores for its contract-level CAHPS measures, which CMS initially declined to disclose. The data revealed that for contracts H3815, the reliability scores for the "Care Coordination" and "Getting Care Quickly" measures were each just a few one-thousandths of a point above the very-low-reliability threshold of 0.60. Because these measures' reliability scores were within a breath of 0.60, a *single* enrollee's inapt response could have caused their disqualification as "Very Low Reliability" measures.

107.   CMS routinely disqualifies contract-level, measure-level CAHPS results for failure to meet the 0.60 reliability threshold. There were at least 75 such instances, across at least seven CAHPS measures, in 2025 alone, just in the California and Arizona markets where the H3815 and H3443 contracts operate.

108.  Upon information and belief, if the CAHPS survey responses from Spanish-speaking enrollees in the H3815 and H3443 contracts had not been depressed by either a sampling error or survey distribution error, the measure-level scores for the "Care Coordination" and "Getting Care Quickly" measures would have been disqualified as very low reliability. If just these two measures had been excluded from these contracts' Star Ratings, contract H3815 would have achieved an overall 4.5 Stars rather than 4.0 Stars and contract H3443 would have achieved an overall 4 Stars rather than 3.5 Stars.

109.  The impact of unreliable data on these contracts was not limited to these two measures. For contract H3815, the "Customer Service" measure, calculated from three questions, had two labeled as "Very Low Reliability." Both H3815 and H3443 had one of the three questions in the "Getting Needed Prescription Drugs" measure flagged as having "Very Low Reliability." These widespread reliability issues cast serious doubt on the accuracy and fairness of the ratings assigned to these contracts.

110.  Alignment called CMS's attention to the unexplained declines in Spanish-speaking enrollee responses during the plan preview periods, but CMS declined to conduct a meaningful review of the issue and refused to adjust the CAHPS measure scores for the H3815 and H3443 contracts.

111.  The agency's first response was to assert that Alignment had used only CMS's own data as a source of language information, faulting Alignment for not furnishing its own Spanish-speaker data to the survey contractor. But when Alignment pointed out that it had done precisely that, CMS's only further response was to say—without elaboration or evidentiary support—that the survey contractor promised that the CAHPS questionnaires were distributed appropriately and no sampling error was made.

112.  Alignment asked CMS to provide data sufficient to allow Alignment to verify that there had not been a sampling error and that the survey vendor properly distributed

Spanish-language questionnaires to Spanish-speaking enrollees. The requested data included, but was not limited to:

> (a.)    sample selection data, which Alignment would have used to verify that eligible members with at least six months of continuous enrollment were randomly selected according to survey rules;

> (b.)    beneficiary fulfillment data, which Alignment would have used to verify that surveys were distributed in enrollees' preferred languages;

> (c.)    response data and segmentation reports, which Alignment would have used to independently validate score calculations; and

> (d.)    phone outreach data, which Alignment would have used to confirm that every beneficiary received the required number of outreach attempts, as specified in CMS's guidance on the CAHPS survey.

113.    CMS refused to disclose any of these data. The agency offered only generic and boilerplate responses that did not meaningfully address the substance of Alignment's concerns and did not allow Alignment to confirm any of the agency's naked assertions.

### C.    CMS's methodology for calculating CAHPS-measure Star Ratings is biased toward plans with larger member populations

114.    The relative distribution and significance testing methodology that CMS uses to calculate the measure-level Star Ratings for CAHPS measures produces unreliable results because the significance testing step systematically disadvantages smaller plans that are unable to oversample.

115.    On at least two measures ("Rating of Drug Plan" and "Rating of Health Plan"), contract H3815 earned a better mean score than, and the same reliability score as, several other contracts that received a higher Star Rating for the measure. On both of these

measures, contract H3815 received 4.0 Stars while other contracts received 5.0 Stars, despite that contract H3815 achieved a higher mean score and had the same reliability.

116.   These other contracts achieved a higher Star Rating on these two measures because they engaged in oversampling, obtaining between about 1200 and 3000 responses to their CAHPS surveys. Oversampling by around five- or ten-fold, these contracts were able to achieve "above average" significance scores. CMS's significance methodology thus rewarded these other plans with higher Star Ratings—despite *lower* mean scores—simply because they are larger and engaged in oversampling.

117.   Only contracts with substantially more than 800 CAHPS survey-eligible enrollees are able to oversample. CMS's methodology for calculating Star Ratings for CAHPS measures is arbitrarily biased in favor larger contracts, and especially those that are large enough and willing to engage in oversampling.

### D.    Maximus departed from CMS guidance and its own manual in reviewing Alignment's dismissal of an appeal

118.   CMS contracts with Maximus Federal Services as the "independent, outside entity," or IRE, authorized under 42 C.F.R. § 422.590(i) to review MAOs' adverse resolutions of reconsideration requests. *See* CMS, *Reconsideration by Part C Independent Review Entity (IRE)*, https://bit.ly/3ZQRlE9.

119.   Maximus is a private, for-profit corporation incorporated and headquartered in Virginia. Since 1997, it has been a publicly traded corporation.

120.   In a memo that CMS issued to MAOs concerning the availability of underlying measure data that plans could use to validate their Star Ratings, the agency directed plans to the Maximus website (www.medicareappeal.com) for "[i]nformation regarding the Part C reconsideration process." CMS, *Information to Review Data Used for Medicare Part C and D Star Ratings and Display Measures* 3 (Apr. 11, 2024), perma.cc/Z5V3-3V4C.

121.   The memo further explained that measure data for the "Plan Makes Timely Decisions about Appeals" and the "Reviewing Appeals Decisions" measures are also available on the Maximus website. *Id.* In case MAOs notice discrepancies or have other concerns about the data, the memo instructs them to "bring these issues to the attention of Maximus as they arise" and "encourage[s]" MAOs to "email any questions they may have about the data to medicareappeal@maximus.com." *Id.*

122.   In a guidance document concerning the process for MAO reconsideration and IRE review, CMS instructs that a "non-contract provider" may "request a reconsideration (i.e., an appeal) for a denied claim only if the non-contract provider completes a Waiver of Liability (WOL) statement, which provides that the non-contract provider will not bill the enrollee regardless of the outcome of the appeal." *Appeals Guidance*, at 60. This Waiver of Liability "must be filed with the appeal." *Id.*

123.   In cases where a non-contracted provider submits a request for reconsideration of a denied claim, but fails to submit the required Waiver of Liability statement, CMS directs the MA plan that receives the request to "make attempts to secure the missing documentation." But, if such attempts prove fruitless, the plan should "dismiss[] the request." *Id.* at 76.

124.   Maximus uses a Reconsideration Process Manual that sets forth "the procedures for the coordination of [MA plans] with Maximus in the processing of IRE level reconsiderations." Maximus, *Medicare Health Plan Reconsideration Process Manual* 6 (Sept. 2024), https://perma.cc/7346-PRMA. Maximus underlines that where the manual uses mandatory language, such as the term "must," then "complete compliance" by the MA plan "is expected." *Id.*

125.   The Reconsideration Process Manual directs that a "non-contract provider" may become a party to a request for an MAO to reconsider a denial of coverage only if that

non-contract provider "has executed a *Waiver of Liability* form," which serves to "ensure that the enrollee will not be held financially liable if the provider loses the appeal." *Id.* at 21. If an MA plan receives a reconsideration request without the required Waiver of Liability document, then the "reconsideration review should not begin" (*id.* at 24), and the plan "*must* dismiss the request and issue a Notice of Dismissal of Appeal Request" (*id.* at 21 (emphasis added)).

126. In reviewing Case 1-13226962526, Maximus failed to abide by its own manual and the CMS guidance on the appeals process. This case began when Alignment's delegated entity for claims processing, Arizona Priority, received a claim for coverage from an out-of-network provider, Arizona Diagnostic Radiology Group LLC. The claim was for a lower extremity study, with pain in the right leg as the stated primary diagnosis. After three unsuccessful attempts to obtain medical records to support the claim, Arizona Priority denied coverage. The denial notice issued to the out-of-network provider included details on the timeline to submit a request for reconsideration, and explained that any such request must be submitted with a Waiver of Liability form.

127. Arizona Diagnostic Radiology submitted a request for reconsideration, attaching medical records to support the claim, but without attaching a completed Waiver of Liability form. Arizona Diagnostic Radiology subsequently filed their request for reconsideration with Alignment, again without a signed Waiver of Liability. Despite repeated efforts to obtain a Waiver of Liability, Arizona Diagnostic Radiology never submitted the required form. Consistent with CMS guidance and the Reconsideration Process Manual issued by Maximus, Alignment therefore dismissed the request.

128. Because it was untimely, Alignment auto-forwarded the case to Maximus. Maximus, in turn, did not dismiss the reconsideration request or vacate Alignment's dismissal, as its manual and CMS guidance both require. Instead, it affirmed Alignment's

denial of coverage on its merits. This was inconsistent not only with Maximus's own manual and CMS guidance, but also with Maximus's own practice—as a matter of course, it routinely dismisses untimely appeals.

129.   Had Maximus dismissed the request for reconsideration owing to the lack of a signed Waiver of Liability, the appeal would have been excluded from the "Plan Makes Timely Decisions about Appeals" measure. *2025 Technical Notes*, at 75. But because Maximus entered a determination on the merits instead, the H3443 measure-level score for fell from 5.0 Stars to 3.0 Stars.

### E.     Maximus incorrectly overturned Case 1-12757246876

130.   Alignment received a $254 claim from contracted provider Sonora Quest Laboratories on January 20, 2023, for a date of service on January 5, 2023. The service was for outpatient laboratory services. Alignment denied the claim on February 10, 2023, explaining that the enrollee had other primary health insurance coverage at the time of the claim receipt. The remittance advice to the contracted provider noted that the claim was "missing prior insurance carriers EOB." As Alignment's provider manual states expressly, this was a direction to the provider that the enrollee had another primary insurer on CMS enrollment records.

131.   On February 24, 2023, the enrollee filed an appeal (No. 1-12757246876) stating that she no longer had other primary health insurance coverage and that her other policy had terminated in November of 2022. During the appeal review, Alignment confirmed in CMS's enrollment data that that was untrue, and the enrollee still had other primary health insurance coverage active as of the appeal date. On April 25, 2023, the enrollee confirmed that she indeed had other primary health insurance coverage. The same day, Alignment upheld the denial.

132.   Alignment submitted the upheld appeal to Maximus. Maximus overturned the denial July 27, 2023, concluding (wrongly) that the plan had failed to coordinate coverage with the primary insurer. As explained by Maximus in its own IRE response, an MA plan can coordinate benefits with a primary insurer by, among other things, directing the provider to contact the primary insurer.

133.   Alignment did exactly that. It notified the provider that the claim was being denied because the enrollee had other primary insurance, thus instructing the provider to submit the claim to the primary insurance first. If the primary insurance had already paid or denied the claim, the provider was asked to send a copy of the primary insurance remittance advice.

134.   Had Maximus correctly upheld the denial of Case 1-12757246876, contract H3443's score for the "Reviewing Appeals Decisions" measure would have been 5.0 Stars rather than 3.0 Stars.

**F.    Final agency action**

135.   CMS issued the final 2025 Star Ratings on October 10, 2024. The determination of the 2025 Star Ratings is final, not tentative; CMS does not require or provide for appeals or other internal review of Star Ratings methodology. The plan preview periods are the last opportunity that an MAO may or must use to administratively challenge an adverse change in a contract's Star Rating from one year to another resulting from the use of erroneous data or unreliable and unlawful calculation methodologies. *See* 42 C.F.R. § 422.260(c)(3)(ii) (providing for administrative review of QBP determinations but excluding challenges to the "methodology for calculating the star ratings" and the "cut-off points for determining measure thresholds").

136.   A final Star Rating determines legal rights and obligations, and legal consequences flow from them. For example, CMS may terminate a plan's MA contract that has

failed to achieve a Part C summary rating of at least three stars for three consecutive contract years. *Id.* § 422.510(a)(4)(xi). In addition, while plans are typically barred from allowing Medicare beneficiaries to switch to their plan until the annual enrollment period, regulations permit such a switch at any time during the year if the plan into which a beneficiary moves has a 5.0 Star Rating. *Id.* § 422.62(b)(15).

137.  Issuance of Star Ratings also immediately injures adversely affected plan sponsors like Alignment. When the MA annual enrollment period begins on October 15, 2024 (following publication of all Star Ratings in Medicare Plan Finder) the Star Ratings impact each plan's reputation.

## CLAIMS FOR RELIEF

### Count I
### The Tukey Outlier Deletion Rule is arbitrary and capricious as applied to Alignment

138.  Alignment realleges the allegations set forth in all prior paragraphs of this complaint as though fully set forth herein.

139.  The APA directs a "reviewing court" to "hold unlawful and set aside" arbitrary and capricious agency action. 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). To meet this standard, an agency must "offer[] a satisfactory explanation for its action" and "cannot simply ignore [any] important aspect of the problem." *Ohio v. EPA*, 144 S. Ct. 2040, 2053 (2024) (cleaned up).

140.  CMS justified its proposal to introduce Tukey outlier deletion by asserting that it would improve the stability and predictability of cut points from year to year. But Alignment showed that adopting this method would lead to huge increases in the cut points for seven measures, including the five mostly heavily weighted measures. Alignment also

showed that outlier deletion would compress the spreads from cut-point-to-cut-point, resulting not only in inflated cut points, but also excessive sensitivity to even the minutest changes in data. Alignment showed that these changes rendered the Star Ratings arbitrary, capricious, and unfair without at least an upward adjustment to the minimum denominator requirement for each non-CAHPS measure.

141.   CMS responded by denying that the Tukey method would reduce reliability and declining to consider changes to its minimum denominator requirements.

142.   CMS has not offered a reasonable explanation for its decision to apply the Tukey outlier deletion method without increasing the minimum denominator thresholds for each measure to ensure that each contract can achieve each one of the five Star Ratings on each measure. In rejecting the need to adjust minimum denominator thresholds to maintain reliability, it disregarded an important aspect of the problem.

143.   As applied to contracts with denominators too small for the contract to earn each of the five Star Ratings, the Tukey Outlier Deletion Rule is arbitrary and capricious.

144.   The Court should vacate Alignment's 2025 Star Ratings for the adversely affected contract with a measure-level denominator too small for the contract to earn each of the five Star Ratings on that measure, contract H9686. The Court should remand the matter to the agency with directions to recalculate Alignment's 2025 Star Ratings without consideration of any such arbitrary measure-level Star Ratings.

**Count II**
**CMS has unconstitutionally delegated governmental authority**

145.   Alignment realleges the allegations set forth in all prior paragraphs of this complaint as though fully set forth herein.

146.   "Federal lawmakers cannot delegate regulatory authority to a private entity," as to "do so would be 'legislative delegation in its most obnoxious form.'" *Association of*

35

*American Railroads v. U.S. Department of Transportation*, 721 F.3d 666, 670 (D.C. Cir. 2013), *vacated and remanded on other grounds*, 575 U.S. 43 (2015) (quoting *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)). Thus, while private entities may "help a government agency make its regulatory decisions," "private parties must be limited to an advisory or subordinate role." *Id.* at 671, 673.

147.    Courts have formulated a clear test for when a private entity is properly limited to a subordinate advisory role: Government officials must retain final decision-making authority, they must actually exercise that authority instead of simply rubber-stamping the decisions of the private entity, and the private entity must remain subject throughout to the "pervasive surveillance and authority" of a government official. *Consumers' Research v. FCC*, 109 F.4th 743, 769-770 (5th Cir. 2024) (en banc) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 388 (1940)).

148.    CMS delegates authority to Maximus to perform independent reviews of MAOs' decisions relating to requests for reconsideration of adverse coverage determinations. While Maximus's decisions are subject to further review through an ALJ hearing if requested by the enrollee or the enrollee's healthcare provider, MAOs have no right to request further review by an ALJ. Decisions by Maximus to vacate an MAO's dismissal of a request for reconsideration, or to vacate an MAO's determination on reconsideration affirming denial of coverage, are final and binding on MAOs.

149.    CMS also delegates authority to Maximus to resolve issues raised by MAOs regarding the Star Ratings calculations and underlying data for the "Plan Makes Timely Decisions about Appeals" and the "Reviewing Appeals Decisions" measures.

150.    CMS's delegations of regulatory authority to Maximus are unconstitutional. The IRE review process and Maximus's role in resolving disputes regarding the calculation of Star Ratings are unlawful delegations of governmental authority.

151.   The Court should declare that the IRE review process is unconstitutional and set aside Alignment's 2025 Star Ratings. The Court should remand the matter to CMS with directions to recalculate the 2025 Star Ratings for the adversely affected contract, H3443, with proper and non-delegated agency review of the "Plan Makes Timely Decisions about Appeals" and the "Reviewing Appeals Decisions" measures.

**Count III**
**CMS's methodology for calculating Star Ratings for CAHPS measures**
**is arbitrarily biased in favor of larger contracts**

152.   Alignment realleges the allegations set forth in all prior paragraphs of this complaint as though fully set forth herein.

153.   The methodology that CMS uses to calculate the Star Ratings for CAHPS measures produces arbitrary results because the methodology includes significance testing that is irrationally biased against smaller plans with fewer enrollees.

154.   Alignment's H3815 contract would have received 5.0 Stars on the "Rating of Drug Plan" and "Rating of Health Plan" measures were it not for CMS's arbitrary and capricious consideration of the number of survey respondents.

155.   Accordingly, Alignment's 2025 Star Ratings for the H3815 contract should be set aside. The Court should remand the matter to the agency with directions to recalculate Alignment's 2025 Star Ratings for that contract without consideration of whether the average CAHPS measure score is statistically significantly higher than the national average CAHPS measure score.

**Count IV**
**Errors in the administration of the CAHPS survey**
**with respect to Alignment's Spanish-speaking enrollees**

156.   Alignment realleges the allegations set forth in all prior paragraphs of this complaint as though fully set forth herein.

37

157.   As a general matter, agencies must make available the evidence and data that support their decisions. *See Air Transportation Association of America, Inc. v. Department of Agriculture*, 37 F.4th 667, 677 (D.C. Cir. 2022) ("the most critical factual material that is used to support the agency's position" must be made "public") (quoting *Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System*, 745 F.2d 677, 684 (D.C. Cir. 1984)).

158.   In addition, "a fundamental norm of administrative procedure requires an agency to treat like cases alike." *Consolidated Edison Company of New York, Inc. v. FERC*, 45 F.4th 265, 279 (D.C. Cir. 2022) (quoting *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007)). "Unexplained inconsistency is . . . a reason for holding [agency action] to be" arbitrary and capricious. 32 Wright & Koch, *Federal Practice and Procedure* § 8248, at 431 (2006) (citing *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967, 981 (2005)).

159.   Alignment provided data concerning its Spanish-speaking enrollees and their preference to receive communications in Spanish. Upon information and belief, either CMS under-sampled Spanish-speaking enrollees or the CAHPS-survey vendor did not provide Spanish-language questionnaires to Alignment's designated Spanish-speaking enrollees for contracts H3815 and H3443. By either path, CMS and the CMS-approved survey vendor effectively did not permit Alignment to designate Spanish-speaking enrollees for contracts H3815 and H3443, as other plans are permitted to do.

160.   It was arbitrary and capricious and not in accordance with law for CMS or its approved vendor to conduct the CAHPS surveys without following Alignment's directions, the vendor's own guidelines, or CMS's own rules.

161.   In addition, CMS did not disclose any of the data needed for Alignment to confirm proper handling of the CAHPS survey or to validate the survey results. It is arbi-

trary and capricious for an agency to issue a final decision in a black box, without permitting the regulated public an opportunity to review and validate the agency's work.

162.  Accordingly, Alignment's 2025 Star Ratings for the H3815 and H3443 contracts should be set aside. The Court should remand the matter to the agency for re-calculation of Alignment's 2025 Star Ratings without consideration of CAHPS survey results for those contracts.[1]

**Count V**
**Maximus failed to dismiss a request for reconsideration**
**in violation of its own guidelines and CMS's rules**

163.  Alignment realleges the allegations set forth in all prior paragraphs of this complaint as though fully set forth herein.

164.  "An agency may not of course depart from prior policy without explanation." *ANR Pipeline Co. v. FERC*, 205 F.3d 403, 407 (D.C. Cir. 2000). And, again, "a fundamental norm of administrative procedure requires an agency to treat like cases alike." *Consolidated Edison*, 45 F.4th at 279.

165.  CMS guidance concerning requests for reconsideration and IRE review instruct that a request for reconsideration must be dismissed if not accompanied by a Waiver of Liability. Maximus's Reconsideration Process Manual contains the same instruction.

166.  For Case 1-13226962526, Maximus reviewed a decision by Alignment's third-party claims-processing administrator under contract H3443 to dismiss a request for reconsideration. That dismissal was made because the request for reconsideration was not accompanied by a Waiver of Liability, despite numerous requests for the same.

---

[1]  It bears emphasis at the start that CMS should be required to produce in the administrative record all evidence and data that was before the agency when it determined Alignment's Star Ratings, including Alignment's CAHPS data. An agency cannot avoid production of a complete AR by unilaterally labeling certain documents "confidential" in its decisionmaking process.

167.   Maximus did not dismiss the ensuing request for reconsideration, as it has in other similar cases and as all applicable rules require given the absence of the Waiver of Liability. Maximus instead issued a reconsidered determination affirming the underlying adverse coverage determination.

168.   Maximus did not provide an explanation for why it deviated from the normal policy applied in similar cases. Maximus's or CMS's inclusion of Case 1-13226962526 in calculating the "Plan Makes Timely Decisions about Appeals" measure for contract H3443 was therefore arbitrary and capricious.

169.   Inclusion of Case 1-13226962526 in calculating the "Plan Makes Timely Decisions about Appeals" measure for contract H3443 resulted in a lower Star Rating for the contract. The 2025 Star Ratings for contract H3443 thus should be set aside. The Court should remand the matter to the agency with directions to recalculate the contract's 2025 Star Ratings, excluding Case 1-13226962526 from the calculation of the measure-level score for the "Plan Makes Timely Decisions about Appeals" measure.

### Count VI
### Maximus wrongly reversed the denial of Case 1-12757246876

170.   Alignment realleges the allegations set forth in all prior paragraphs of this complaint as though fully set forth herein.

171.   Maximus held that Alignment wrongly denied Case 1-12757246876 because Alignment failed to coordinate coverage with the enrollee's primary insurer. That is demonstrably incorrect. Alignment in fact directed the provider to bill or otherwise communicate with the enrollee's primary insurer, which is all that Maximus's rules require.

172.   Inclusion of Case 1-12757246876 as an overturned denial in calculating the "Reviewing Appeals Decisions" measure for contract H3443 resulted in a lower Star Rating for the contract. The 2025 Star Ratings for contract H3443 thus should be set aside.

The Court should remand the matter to the agency with directions to recalculate the contract's 2025 Star Ratings, including Case 1-12757246876 as "upheld" in the calculation of the measure-level score for the "Reviewing Appeals Decisions" measure.

## PRAYER FOR RELIEF

WHEREFORE, Alignment asks the Court to enter judgment in its favor and:

(a.)    Declare that it is arbitrary and capricious to apply the Tukey Outlier Deletion Rule without also applying minimum denominator requirements sufficient to ensure that each contract can earn all five Star Rating—1, 2, 3, 4, and 5—for each measure;

(b.)    Declare that either CMS, or Congress, or both have unconstitutionally delegated governmental authority to a private entity by delegating decision-making power to Maximus Federal Services in the independent-review process and in the calculation of the "Plan Makes Timely Decisions about Appeals" and the "Reviewing Appeals Decisions" measure scores;

(c.)    Set aside the 2025 Star Ratings for contracts H3443 and H3815 and remand to the agency for recalculation of those contracts' 2025 Star Ratings without consideration of any CAHPS survey measures.

(d.)    Set aside the 2025 Star Ratings for contracts H3443, H3815, and H9686 and remand to the agency for recalculation of those contracts' 2025 Star Ratings without consideration of any of the errors or faulty data otherwise identified in this complaint or later identified in the administrative record;

(e.)    Award Alignment such other and further relief as the Court may deem just and proper, including costs and attorneys' fees as permitted by law.

Dated: January 10, 2025                    Respectfully submitted,

*/s/ Michael Kimberly*

Michael B. Kimberly
  D.C. Bar No. 991549
Caleb H. Yong
  D.C. Bar No. 1780922

MᴄDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP
500 North Capitol Street N.W.
Washington, D.C. 20001
(202) 756-8901
mkimberly@mwe.com
cyong@mwe.com

*Counsel for Alignment*